IN MANDAMUS ON OBJECTIONS TO MAGISTRATE'S DECISION
{¶ 1} Morton International, Inc. ("Morton"), filed this action in mandamus seeking a writ which compels the Industrial Commission of Ohio ("commission") to vacate its order authorizing surgery for Dawn Stark and to vacate its order granting payment for Dawn *Page 2 
Stark's treating physician, John H. Paul, M.D. Morton asks that the commission be compelled to enter new orders denying the surgery and refusing payment for Dr. Paul.
 {¶ 2} In accord with local rules of procedure, this action was referred to a magistrate of this court to conduct appropriate proceedings. The parties stipulated to the pertinent evidence and filed briefs. The magistrate then prepared and filed a magistrate's decision which contains detailed findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate's decision includes a recommendation that we grant Morton the relief it seeks as to the neck surgery and return the issue of payment of Dr. Paul's bills to the commission for additional review and factual findings.
 {¶ 3} Counsel for Dawn Stark has filed objections to the magistrate's decision and its recommendation. Counsel for Morton has filed a memorandum in response. The case is now before the court for review.
 {¶ 4} Dawn Stark was working as a laborer for Morton on March 9, 2001, when she was seriously injured. She was in a metal basket which was being lowered to the ground when a weld which attached the basket to the boom, apparently of a crane, broke causing the basket to fall to the ground. Dawn was 29 years of age and had worked for Morton almost seven years as of the day she was injured. She apparently attempted to work for the next two months despite her injury and, in May 2001, a First Report of Injury, Occupational Disease or Death was filed.
 {¶ 5} Morton initially certified the claim for "cervical strain" and "lumbar strain." Subsequently, the claim was recognized in addition for "left shoulder contusion; herniated disc at L4-5, L5-S1; aggravation for pre-existing disc disease C2-3 through C6-7." *Page 3 
 {¶ 6} In May 2001, Dawn Stark complained of pain in both her neck and lower back. She was seen by a number of physicians over the next few years. On May 4, 2002, a decompressive laminectomy at L4-5 with a posterior fusion at L4-5 and L5-S1 was performed. A second lower back surgery was done in October 2005.
 {¶ 7} At the time of her injury, x-rays of Dawn Stark's neck revealed moderate spurring at C3 through C5. The medical reports in the evidence do not indicate that the spurring or other conditions in her neck or back had been symptomatic prior to March 2001 and the industrial injury. After the injury, her neck pain got progressively worse, leading to the necessity of the neck surgery being contested by Morton.
 {¶ 8} Kevin Trangle, M.D., examined Dawn Stark in December 2005 at the request of Morton. Dr. Trangle acknowledged the medical history set forth above, but concluded that the neck operation was necessitated by preexisting degenerative disc disease and arthritic spurring which developed over the years (not a recognized condition) as opposed to pain from the aggravation of the preexisting disc disease at C2-3 through C6-7 (a recognized condition).
 {¶ 9} A district hearing officer ("DHO") for the commission rejected Dr. Trangle's theory of causation because Dawn Stark had no symptoms before the metal basket fell. Staff hearing officers who subsequently reviewed the DHO's analysis found that the surgery was reasonably related to and reasonably necessary for treatment of the allowed conditions.
 {¶ 10} The magistrate, in his magistrate's decision, correctly sets forth the three-prong test for authorization of medical services set forth in State ex rel. Miller v. Indus. *Page 4 Comm. (1994), 71 Ohio St.3d 229. The three-prong test for the authorization of medical services: (1) are the medical services reasonably related to the industrial injury? (2) are the services reasonably necessary for treatment of the industrial injury? and (3) is the cost of such services medically reasonable? This is the same test obviously used by the hearing officers at the commission.
 {¶ 11} The surgery to be performed is a partial corpectomy and fusion at C5-6 and C6-7. This surgery is obviously not a complete removal of the cervical discs, but a removal of part of the disc at C5-6 and C6-7 or both. The magistrate does not really explain why this surgery is not reasonably related to the aggravation of preexisting disc disease at C2-3 through C6-7, as found by the commission's hearing officers or why an ICD-9 code of 722.0 ("[displacement of cervical intervertebral disc without myelopathy") could not be reasonably related to aggravation of preexisting disc disease for purposes of Miller, especially in light of all the other medical information from Dr. Paul submitted to support the motion for authorization for surgery.
 {¶ 12} As a result, we defer to the finding of the hearing officers and reject the magistrate's conclusions of law with respect to the authorization for surgery.
 {¶ 13} Since we do not overturn the commission's finding with respect to the surgery simply because of the existence of the reference to 722.0 among the diagnostic codes, we also do not overturn the commission's decision as to the payment of medical bills. *Page 5 
 {¶ 14} In summary, we accept the findings of fact contained in the magistrate's decision. Based upon the findings of fact and our conclusions of law as set forth above, we deny the requested writ of mandamus.
Objections sustained; writ of mandamus denied.
 SADLER, P.J., and BROWN, J., concur. *Page 6 
 (APPENDIX A) IN MANDAMUS {¶ 15} In this original action, relator, Morton International, Inc., requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order authorizing cervical spine surgery and the payment of medical *Page 7 
treatment, and to enter an order denying authorization for the surgery and the payment of medical treatment.
Findings of Fact: {¶ 16} 1. On March 9, 2001, Dawn Stark ("claimant"), sustained an industrial injury while employed as a laborer for relator, a self-insured employer under Ohio's workers' compensation laws. On that date, claimant and a co-worker were being lowered to the ground in a metal basket. The basket broke lose from the boom causing the basket and claimant to fall to the ground.
 {¶ 17} 2. Initially, relator certified the industrial claim for "cervical strain" and for "lumbar strain."
 {¶ 18} 3. The industrial claim was later additionally allowed for "left shoulder contusion; herniated disc at L4-5, L5-S1; aggravation of pre-existing disc disease C2-3 through C6-7." The claim is disallowed for "disc disease C2-3 through C6-7; herniated disc C5-C6."
 {¶ 19} 4. On May 4, 2002, A. L. Itani, M.D., performed a decompressive laminectomy L4-5 with a posterior fusion L4-5 and L5-S1. Later, claimant underwent further lumbar surgery to remove surgical screws.
 {¶ 20} 5. On March 10, 2005, claimant was examined by her attending physician John H. Paul, M.D. Dr. Paul's March 10, 2005 office note states:
 SUBJECTIVE:
 [One] Acute neck pain. In a scale of 1 to 10, 7 to 10.
 [Two] Lumbar pain. In a scale of 1 to 10, 5.
 [Three] She also gives a complaint of pain radiating from the neck into the left arm.
 [Four] Complaints of numbness in the left hand. *Page 8 
 The patient did have an industrial injury hurting her neck and lower back. The neck allowed condition is sprained neck, lower back. The patient underwent spinal fusion.
 PAST MEDICAL HISTORY: The patient does not give any history of acute chest pain or shortness of breath. PHYSICAL EXAMINATION: 33 yr. old female, Alert. Well oriented for time and place. She ambulates without the help of any aids. Upon examination of the neck the patient is markedly tender and painful all over the cervical region with radiation into the left hand. Bilateral biceps, triceps reflexes are normal with numbness over the dorsal aspect [of] the left dorsum.
 Examination of the back reveals a surgical scar in the lumbar area is noticed and it is healed with no evidence of infection. Range of motion 0 in the back.
 ASSESSMENT:
 [One] Cervical sprain.
 [Two] Herniated lumbar disc.
 PLAN:
 [One] Recommend MRI of C-spine.
 [Two] Physical therapy after MRI.
 [Three] Probably work conditioning and work hardening in the
 near future.
 Finally, I do not recommend the patient return to work until these are done.
 {¶ 21} 6. On March 22, 2005, claimant was again examined by Dr. Paul at his office. Dr. Paul's office note states:
 SUBJECTIVE: Acute neck pain radiating into left upper extremities. Numbness and tingling sensation to left upper extremity. In a scale of 1 to 10, today 7.
 The patient sustained an acute industrial neck injury a cervical sprain of neck has been allowed. The patient went back to *Page 9 
work after injury but this has been getting progressively worse.
 OBJECTIVE: 33 year old female, 5'3", weighs 207 lbs., Alert. Well oriented for time and place. She is ambulatory without the help of any aids. Examination of the cervical spine reveals there is no surgical scar, she has 2+ muscle spasm noticed in the cervical region. Any attempted range of motion of the cervical spine is extremely painful. On palpation, she is tender all over the cervical area. Range of motion is restricted. Bilateral biceps and triceps are within normal limits. There is definite parathesis on the left upper extremity is noticed. There is some amount of weakness of the left upper extremity. Examination of the lower back reveals there is a surgical scar in the midline which is healed. She has no range of motion of the lumbar spine. There is no clinical evidence of infection. On palpation, she is tender in the lumbar area. This patient has no flexion in the lumbar area. Straight leg raising tests bilaterally positive. Lasegue is bilaterally positive.
 ASSESSMENT: Acute cervical sprain.
 PLAN: Absolutely no work, physical therapy. A C9 for PT and repeat MRI of the cervical spine will be sent. * * *
 {¶ 22} 7. On April 5, 2005, claimant returned to Dr. Paul. Dr. Paul's April 5, 2005 office note states:
 SUBJECTIVE:
 [One] Acute low back pain. In a scale of 1 to 10, today 8.
 [Two] Acute neck pain. In a scale of 1 to 10, 9.
 The patient sustained an acute industrial injury injuring her lumbar region. The allowed condition is:
 [One] Cervical sprain
 [Two] Herniated lumbar disc for this she had surgery, fusion with plates and screws.
 OBJECTIVE: 33 year old female, 5'5", weighs 207 lbs., Alert. Well oriented for time and place. She is ambulatory without the help of any aids. Examination of the cervical spine reveals no skin lesions, no surgical scars. Range of motion is *Page 10 
markedly limited due to acute cervical pain. On palpation she is tender in all the cervical and trapezius region. Examination of the lumbar region reveals there is a long midline incision. The surgical scar is healed. No evidence of infection. The patient has no flexion. On palpation she is tender in the lumbar area. Bilateral biceps and triceps reflexes are normal. Bilateral knee and ankle reflexes are normal. There seems to be some amount of parathesis in the left upper extremity noticed. The vascular state of both upper extremities are normal.
 ASSESSMENT:
 [One] Herniated lumbar disc.
 [Two] Cervical sprain.
 PLAN: I do not recommend this patient should not return to work at this time. At this time I recommend sedentary work. We will repeat the MRI of the C-spine because of the numbness and tingling sensation of the left upper extremity.
 A C9 will be sent and she will return after her MRI.
 {¶ 23} 8. On May 9, 2005, claimant returned to Dr. Paul. Dr. Paul's May 9, 2005 office note states:
 The patient sustained an injury and a MRI of the neck has been shown to have a [illegible] cervical as well as lumbar disc. The patient underwent surgery for lumbar area however the cervical disc has not been approved by the BWC. Her other complaint is acute lumbar pain radiating into both lower extremities. In a scale of 1 to 10, again 7.
 {¶ 24} 9. On June 29, 2005, claimant returned to Dr. Paul. Dr. Paul's June 29, 2005 office note states:
 SUBJECTIVE:
 [One] Neck pain. On a scale of 1-10, the pain is 6.
 [Two] Lower back pain. On a scale of 1-10, the pain is 5.
 The patient sustained an acute industrial injury when the lift basket fell and injured her lower back and neck. The patient *Page 11 
 sustained a herniated lumbar disc. She underwent a lumbar laminectomy, discectomy with fusion with rods and screws. She continues to have pain. At this time she is unable to return to work due to consistent problems.
 PAST MEDICAL HISTORY: She was in excellent health prior to this injury.
 OBJECTIVE: 35 [sic] year-old female. Alert and well oriented for time and place. She is ambulatory without the help of any aids.
 Examination of the cervical spine shows there is no surgical scar and there are no skin lesions. The range of motion is full extension to about 10 degrees of flexion. Side-to-side movement and rotation are about 5 degrees. There is obvious Parathesis over the dorsum of the right hand. There is numbness over the posterior aspect of the right shoulder region. Bilateral biceps and triceps reflexes are normal. There is no obvious motor or sensory loss.
 Examination of the lumbar spine shows the long midline incision is healed with no clinical evidence of infection. Straight leg raising test is bilaterally positive. Lasegue[']s is bilaterally positive. Bilateral knee and ankle reflexes are within the normal limits. There are no bowel or bladder symptom.
 ASSESSMENT:
 [One] Cervical sprain
 [Two] Herniated lumbar disc
 RECOMMENDATION:
 [One] The patient tells me she has seen Dr. Itani who has recommended surgery on her neck. However, at this time I do not have a report.
 [Two] I explained to her that the diagnosis of herniated cervical disc has not been approved by the BWC at this time. * * *
 {¶ 25} 10. On June 29, 2005, claimant was examined by Dr. Itani at his office. Dr. Itani's June 29, 2005 office note states: *Page 12 
 Dawn Stark is known to have had industrial injury 3/1/01. She has had interbody fusion L4-5 and L5, S1 in 7/02. Her neck has been followed. However, recently the pain in her neck has increased radiating to both shoulders, medial aspect of the scapulae on both sides and paresthesias in the left upper extremity. She was worked up with MR scanning, came to see me today. Denies any history of gait changes. Denies any history of bladder or bowel involvement. Patient denies any history of diabetes, hypertension, cardiac disease or endocrine problems.
 * * *
 Her examination revealed her neck movements to be uncomfortable in all directions. Motor examination reveals no atrophy or fasciculations. No gross motor deficit in any muscle group. Biceps and brachial radialis absent on the left, 1+ on the right. Triceps absent on the left, 1+ on the right. Sensory examination including posterior column function within normal limits. No evidence of myelopathy.
 MR scan is indicative of disc/osteophyte formation C5,6, central and bilateral, more on the right than the left and osteophyte formation at C6,7.
 I told the patient if she is not comfortable she is going to need partial corpectomy and fusion at C5,6 and C6,7. I shall leave it to her and Dr. Paul for further decision.
 {¶ 26} 11. On July 14, 2005, Dr. Paul completed a C-9 on which he requested authorization for surgery to be performed by Dr. Itani. Dr. Paul described the surgery as "Partial Corpectomy [and] fusion at C5-6 [and] C6-7." The C-9 asks the physician to list the ICD-9 code(s) for the treating diagnoses. In response, Dr. Paul listed: "847.2[,] 722.0 [and] 847.0."
 {¶ 27} 12. 722.0 is the ICD-9 code for "Displacement of cervical intervertebral disc without myelopathy." 847.0 is the ICD-9 code for "cervical sprain." 847.2 is the ICD-9 code for "lumbar strain." *Page 13 
 {¶ 28} 13. Dr. Paul's C-9 prompted relator to have claimant examined by Kevin Trangle, M.D., on December 9, 2005. Dr. Trangle opined:
 In my opinion, this individual had at the time of her injury degenerative disc disease that was rather mild and probably there was some aggravation as indicated previously. Over the next four years, she developed progressive degeneration unrelated to the initial injury. Although she may have had a transient aggravation with the initial injury, she subsequently has had progressive expected course of severe degenerative disc and arthritic disease of the cervical spine consistent with her complaints. These have become progressively worse although they are unrelated to the injury. Although there may have been some transient aggravation of the underlying degenerative disc disease, she has gone for almost three years with no medical intervention of her neck. Ultimately as the degeneration got worse, she sought medical care and now Dr. Itani recommends a fusion operation.
 I believe a fusion operation would help her, however, I do not believe based upon the allowed claim it should be done. Although the claim has been allowed for aggravation of preexisting degenerative disc disease at C2-3, C4-5 and C6-7, it has also been specifically denied for disc herniation C5-6. The operation that he wishes to perform is for the degenerative changes including disc herniation causing the abnormality at C5-6 and C6-7.
 As such, in my opinion based upon a reasonable degree of medical certainty although this operation may be needed, it is not on the basis of the allowed claim. The operation is being done on the basis of degenerative disc disease and arthritic spurring she has developed over the years, which has now led to some neural compromise.
 {¶ 29} 14. On September 21, 2005, claimant moved for authorization of surgery and payment of Dr. Paul's fee bills.
 {¶ 30} 15. Following a January 9, 2006 hearing, a district hearing officer ("DHO") issued an order that authorized the payment of the fee bills. The DHO's order explains: *Page 14 
 The District Hearing Officer orders the self-insured employer to pay the fee bills of John Paul, M.D., for dates of service as follows: 5/3/2004, 4/5/2004, 3/10/2005, 3/22/2005, 4/5/2005, and 6/29/2005. The District Hearing Officer finds that these dates of service represents treatment which was both medically necessary and reasonably related to the allowed conditions in the claim.
 The District Hearing Officer authorizes the treatment requested in the 7/14/2005 C-9 of Dr. Paul, namely, surgery by Dr. Itani; partial c[o]rpectomy, fusion at C5-6 and C6-7.
 In so ruling, the District Hearing Officer relies on the C-9 of Dr. Paul as well as the allowed conditions in the claim.
 The District Hearing Officer considered but found unpersuasive the report of Dr. Trangle dated 12/12/2005. In this report, Dr. Trangle opined that a fusion operation would help the Injured Worker. Dr. Trangle stated, however, that he did not believe that this procedure should be done based upon the allowed conditions in the claim. Dr. Trangle's ultimate conclusion was that the Injured Worker's pre-existing degenerative conditions deteriorated to the point where she now needs to under[go] the requested fusion. In light of the fact that the claim is allowed for an injury to the Injured Worker's cervical area and that [sic] fact that there is no evidence that the Injured Worker suffered from symptomatology in her cervical area prior to the date of injury, Dr. Trangle's opinion that the Injured Worker's current problems are merely the result of a progressive degenerative condition does not seem realistic.
 {¶ 31} 16. Relator administratively appealed the DHO's order of January 9, 2006.
 {¶ 32} 17. Following a February 10, 2006 hearing, a staff hearing officer ("SHO")
issued an order affirming the DHO's order. The SHO's order states:
 It is the order of the Staff Hearing Officer that payment is granted for medical treatment rendered for the following dates of service provided by Dr. Paul: 5/3/04, 4/5/04, 3/10/05, 3/22/05, 4/5/05, and 6/29/05 within usual, customary and reasonable guidelines. *Page 15 
 The Staff Hearing Officer finds that these medical services are reasonably related to and reasonably necessary for the treatment of the allowed condition.
 This decision is based on the fee bills from Dr. Paul for these dates of service.
 Authorization is granted for surgery as specified by Dr. Paul on the 7/14/05 C-9 report within usual, customary, and reasonable guidelines.
 The Staff Hearing Officer finds that this surgery to be provided by Dr. Itani is reasonably related to and reasonably necessary for treatment of the allowed conditions, and the cost is to be medically reasonable.
 This decision is based on Dr. Paul's 7/14/05 C-9 report.
 {¶ 33} 18. On March 8, 2006, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of February 10, 2006.
 {¶ 34} 19. On April 21, 2006, relator, Morton International, Inc., filed this mandamus action.
Conclusions of Law: {¶ 35} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 36} In State ex rel. Miller v. Indus. Comm. (1994),71 Ohio St.3d 229, the court articulated a three-prong test for the authorization of medical services: (1) are the medical services reasonably related to the industrial injury? (2) are the services reasonably necessary for treatment of the industrial injury? and (3) is the cost of such services medically reasonable?
 {¶ 37} Only the first-prong of the Miller test is at issue here. *Page 16 
 {¶ 38} In authorizing surgery, the SHO's order of February 10, 2006 states reliance upon the July 14, 2005 C-9 from Dr. Paul. Earlier, the DHO specifically rejected Dr. Trangle's opinion that the requested surgery was not reasonably related to the allowed conditions of the claim. Thus, the issue here is whether Dr. Paul's July 14, 2005 C-9 constitutes some evidence to support a finding that the requested surgery is reasonably related to an allowed condition of the claim. The magistrate finds that the C-9 is not some evidence supporting authorization for the surgery.
 {¶ 39} As previously noted, on the C-9, Dr. Paul lists ICD-9 codes for his treating diagnoses. Obviously, the cervical strain (847.0) and the lumbar strain (847.2) do not support surgery. The only listed ICD-9 code that could support surgery is 722.0 "Displacement of cervical intervertebral disc without myelopathy." However, that is not an allowed condition of the claim. The 722.0 ICD-9 code does not describe an allowed condition of the claim and, thus, cannot support the requisite causal connection between the industrial injury and the request for surgery.
 {¶ 40} Moreover, while the SHO's order fails to mention Dr. Itani's June 29, 2005 office note, Dr. Paul's C-9 specifically states that the surgery is to be performed by Dr. Itani. Accordingly, Dr. Itani's June 29, 2005 office note is relevant here even though the SHO failed to address it in the order.
 {¶ 41} Dr. Itani's June 29, 2005 office note further shows that the surgery is not reasonably related to an allowed condition of the claim. Again, in his office note, Dr. Itani states: *Page 17 
 MR scan is indicative of disc/osteophyte formation C5,6, central and bilateral, more on the right than the left and osteophyte formation at C6,7.
 I told the patient if she is not comfortable she is going to need partial corpectomy and fusion at C5,6 and C6,7. I shall leave it to her and Dr. Paul for further decision.
 {¶ 42} By definition, a corpectomy involves the surgical removal of a vertebral body due to osteophytes or bone spurs that are compressing the spinal cord. After removal of the vertebral body, a bone graft is placed in the space to obtain a fusion of the remaining vertebrae.
 {¶ 43} Consistent with the definition and purpose of a corpectomy, Dr. Itani's office note indicates that it is the osteophyte formation that produces the need for surgery.
 {¶ 44} There is nothing in Dr. Itani's office note to even suggest that the surgery is causally related to the aggravation of the preexisting disc disease. There is no evidence in the record to suggest that the osteophyte formation was caused by the aggravation or that osteophyte formation is the aggravation.
 {¶ 45} Moreover, Dr. Paul's May 9, 2005 office note states that the MRI shows a "herniated cervical" and that "the cervical disc has not been approved by the BWC." Dr. Paul is correct in stating that the industrial claim is not allowed for a cervical herniated disc. Thus, Dr. Paul's use of ICD-9 code 722.0 appears to be consistent with his May 9, 2005 office note stating that the MRI shows a "herniated cervical."
 {¶ 46} As previously noted, the commission rejected Dr. Trangle's report as being unpersuasive. Clearly, this court need not accept Dr. Trangle's report in order to *Page 18 
conclude that Dr. Paul's C-9 cannot constitute some evidence that the requested authorization for a corpectomy is reasonably related to any allowed condition of the claim.
 {¶ 47} In short, the commission abused its discretion when it authorized the surgery.
 {¶ 48} It does not automatically follow, however, that the office visits with Dr. Paul are not reasonably related to the industrial injury simply because the surgery is not reasonably related.
 {¶ 49} Essentially, each office note corresponding to the dates of service that the commission ordered paid must be evaluated to determine whether the office visit was reasonably related to one or more allowed conditions of the claim. If the SHO performed this office note review to reach his determination, it is not explained in the SHO's order at issue. That is to say, the SHO's order of February 10, 2006 provides no reasoning as to why the fee bills for the various dates of service at issue are for medical treatment or services reasonably related to one or more allowed conditions of the claim. Thus, that portion of the SHO's order granting payment for the fee bills violates State ex rel. Noll v.Indus. Comm. (1991), 57 Ohio St.3d 203, the syllabus of which states:
 In any order of the Industrial Commission granting or denying benefits to a claimant, the commission must specifically state what evidence has been relied upon, and briefly explain the reasoning for its decision.
 {¶ 50} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its SHO's order of February 10, 2006, and to enter a new order that denies authorization for the surgery *Page 19 
and that provides the reasoning or analysis as to why each of Dr. Paul's fee bills are either reasonably related or not reasonably related to the industrial injury. *Page 1